## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **MICHAEL MASSIAH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:21-cv-00066** |
| | ) | **Judge Aleta A. Trauger** |
| **TENNESSEE STATE UNIVERSITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Before the court are the following motions: (1) Motion for Judgment on the Pleadings (Doc. No. 32), filed by defendant Tennessee State University ("TSU"); (2) plaintiff Michael Massiah's Motion to Amend Complaint (Doc. No. 40); and (3) TSU's Motion for Summary Judgment (Doc. No. 43). For the reasons explained herein, the plaintiff's Motion to Amend Complaint will be denied based on the plaintiff's failure to comply with Local Rule 7.01(a)(1); TSU's Motion for Summary Judgment will be granted, and its Motion for Judgment on the Pleadings will be denied as moot.

## I.   PROCEDURAL HISTORY

Michael Massiah was formerly employed by TSU's Campus Police Department as a police officer in training. His employment was terminated effective December 31, 2020. Massiah, through counsel, filed his Complaint on January 28, 2021, asserting claims for (1) disability discrimination and failure to accommodate a disability in violation of the Americans with Disabilities Act ("ADA) and the Tennessee Disability Act ("TDA"); and (2) retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"). (Doc. No. 1.) In his Complaint, the

plaintiff sought punitive and liquidated damages in addition to compensatory damages and a declaratory judgment.

In March 2021, TSU filed a Motion for Partial Dismissal of the Complaint, seeking dismissal of the plaintiff's ADA and TDA claims on the grounds of sovereign immunity and for dismissal as a matter of law of his claim for liquidated and punitive damages. (Doc. No. 8.) The plaintiff chose not to respond to the motion, and the court granted it as unopposed, under Local Rule 7.01(a)(3) (Doc. No. 10), leaving for resolution only the plaintiff's Title VII retaliation claim.

TSU filed its Motion for Judgment on the Pleadings as to that claim on April 12, 2022. After the motion was fully briefed, the plaintiff filed his Motion to Amend Complaint. In response to the latter, the court entered an Order on May 13, 2022, notifying the plaintiff that the motion would be held in abeyance until plaintiff's counsel complied with Local Rule 7.01(a)(1). (Doc. No. 41.) That rule simply requires that

> all motions [with limited exceptions] must state that counsel for the moving party has conferred with all other counsel, and whether or not the relief requested in the motion is opposed. In those instances where counsel for the moving party is unable to confer with all other counsel, the motion must describe all attempts made to confer with counsel and the results of such attempts.

L.R. 7.01(a)(1). Plaintiff's counsel has never complied with Local Rule 7.01(a)(1), so the Motion to Amend has remained in abeyance. Because the court finds, as set forth herein, that the defendant's Motion for Summary Judgment should be granted, the plaintiff's Motion to Amend will be denied as moot and for failure to comply with Rule 7.01(a)(1).

On June 9, 2022, while the other motions remained pending, TSU filed its Motion for Summary Judgment, supporting Memorandum of Law, Statement of Undisputed Material Facts, and a substantial quantity of evidentiary material, including (1) excerpts from, and several exhibits to, Massiah's deposition; (2) excerpts from, and one exhibit to, Harold Taylor's deposition; (3) the Declaration of Gregory Robinson, in his capacity as Chief of Police and Assistant Vice President

of TSU, to which are attached several exhibits; and (4) the Declaration of Glenda Glover, TSU's President, to which is attached as an exhibit a Memorandum addressed to her from TSU's Vice President for Business and Finance, Horace Chase, recommending Massiah's termination, which was signed and approved by Glover on December 7, 2020 and by Linda Spears, Associate Vice President of Human Resources, on December 4, 2020. (Doc. Nos. 43, 44, 45, and 46-1 through 46-6.) Because the parties have conducted discovery and the Motion for Judgment on the Pleadings has been superseded by the Motion for Summary Judgment, the court will deny the former as moot without addressing it on the merits.

After having been granted an extension until July 5, 2022 to file his response, Massiah filed his Response to the Motion for Summary Judgment, supporting Memorandum, and various deposition excerpts and exhibits on July 6, 2022, a day late. (Doc. Nos. 50, 51, 51-1 through 51-17.) The plaintiff also attempted to file the Declaration of Michael Massiah. The Clerk, however, struck the document and notified the plaintiff that Massiah's Declaration would be disregarded because it was not signed by the declarant and was not submitted with a certificate of service. (*See* Doc. No. 52.) The plaintiff did not attempt to refile Massiah's Declaration until July 21, 2022. (Doc. No. 55.) Although this document reflects a signature, it is illegible, and the verification documentation submitted with it indicates that it was emailed to, viewed by, and signed by "Shelby Pressley," at the email address mkmassiah@gmail.com.[1]

---

[1] Shelby Pressley is not identified in the record. In the Internal Complaint Investigation report, discussed below, the investigator states that Shelby Pressley is "believed to be the female" with whom a process server spoke at 2272 Killington Drive, but the plaintiff, according to the report, declined to answer when asked who Shelby Pressley is and also declined to state whether Pressley resided at 2272 Killington Drive. (Doc. No. 46-5, at 16.) The same report identifies 2272 Killington Drive, Clarksville, Tennessee as Massiah's "listed residence." (*Id.* at 11.)

In his Response Memorandum, Massiah states his intention to "refer [therein] to the Statement of Material Facts and Statement of Additional Material Facts . . . as 'SAMF' which is filed contemporaneously with this Memorandum." (Doc. No. 51, at 1.) However, the plaintiff did not file a Statement of Material Facts or a Statement of Additional Material Facts with his Memorandum, nor did he file a response to the defendant's Statement of Undisputed Facts. The defendant filed a Reply (Doc. No. 54) that, among other things, points out these apparent oversights. The plaintiff, to date, has never attempted to correct them.

## II. UNDISPUTED FACTS

This court's Local Rules require that any party filing a motion for summary judgment accompany its motion with a "separate, concise statement of the material facts as to which the moving party contends there is no genuine issue for trial." L.R. 56.01(b). Each fact must be set forth in a separate, numbered paragraph and supported by a specific citation to the record. *Id.* The rules further provide that any party opposing the motion for summary judgment must respond to each fact set forth by the movant by either agreeing that the fact is undisputed, agreeing that the fact is undisputed for purposes of the motion for summary judgment, or "[d]emonstrating that the fact is disputed," by citing to a specific portion of the record. L.R. 56.01(c)(3). Such response must either be made on the document provided by the movant or "on another document in which the non-movant has reproduced the facts and citations verbatim as set forth by the movant" and has responded to each fact "immediately below each fact set forth by the movant." *Id.* This response must be filed with the non-movant's response in opposition to the motion for summary judgment. *Id.* The non-movant's response may also contain a concise statement of additional material facts as to which the non-movant contends there is a factual dispute. *Id.* If a non-moving party fails to file a timely response to the movant's statement of material facts, "the asserted facts shall be deemed undisputed for purposes of summary judgment." L.R. 56.01(f).

The defendant filed its Statement of Undisputed Material Facts, provided citations to the record to support each asserted fact, and has filed copies of the cited evidentiary material with its motion. (Doc. Nos. 45, 46-1 through 46-6.) The plaintiff, however, has not satisfied his obligation to respond to the Statement of Undisputed Material Facts. The court, therefore, deems the facts as set forth by the defendant to be undisputed. They are as follows.

### A.    The Plaintiff's Employment, Discipline, and Termination

Michael Massiah began his employment with the TSU Police Department ("PD") in December 2019 as a police officer in training. TBR Policy 5.01.07.00 applies to TSU PD. (Doc. No. 46-5, Robinson Decl. ¶ 3.[2]) This Policy states in part that any person employed as a campus police officer must "meet the minimum certification requirements set by the Tennessee Peace Officers Standards and Training Commission." (Doc. No. 46-5, at 7.) According to Chief Robinson, TSU police officers in training are required to attend a law enforcement training academy that is certified by the Peace Officers Standards and Training ("P.O.S.T.") Commission if they are not commissioned police officers at the time of hire. (Robinson Decl. ¶ 4.) Massiah was not a commissioned police officer at the time he was employed by TSU. On June 10, 2020, Massiah signed a document acknowledging that his employment with TSU PD was contingent upon his obtaining P.O.S.T. certification. (Doc. No. 46-2, at 23.)

New state employees start with zero sick days and zero annual leave (or vacation) days accrued. They accrue one sick day and one annual leave day per month of work, provided they have worked the necessary hours that month to accrue leave. As of August 2, 2020, Massiah had accumulated approximately 363 hours of absences from work for which he was listed as either

---

[2] The defendant erroneously cites ¶ 1.

sick or absent without leave. His absences from work exceeded his accrued leave. As a result, on August 2, 2020, he was "disempowered" and placed on administrative leave with pay.[3]

In late August 2020, TSU PD began conducting an Internal Affairs investigation of Massiah, based on a Community Complaint filed against him. (Robinson Decl. ¶ 6.) According to the Internal Complaint Investigation report ("ICI report") attached as an exhibit to Robinson's Declaration, TSU PD was presented with a "Community Complaint" filed by Calvin Hullett, who alleged that, in the course of his employment, he and his team (from a company named "Out of Bounds") had attempted to serve civil process on Massiah numerous times between June 18 and August 28, 2020, to no avail. (ICI report, Doc. No. 46-5, at 11.) Mickey Gleason, also with Out of Bounds, contacted the TSU PD Chief of Police, advised him of attempts to serve, and requested assistance. Arrangements were made with Gleason to have him serve Massiah at TSU PD's headquarters on August 29, 2020. (Id.)

The Community Complaint signed by Calvin Hullett was assigned to Detective Thomas Phelps of TSU PD's Internal Affairs Unit for review and investigation. (Id.) Hullett's Complaint, as described in the ICI report, provided the dates and details of six attempts by employees of Out of Bounds to serve process on Massiah in an unrelated civil case originating in Montgomery County Chancery Court, involving a property dispute. (Id. at 11–12.)[4]

---

[3] Robinson states in his Declaration that "[d]isempowerment means that a police officer or trainee . . . must turn in his TSU PD issued gun, TSU PD badge and identification, and is not allowed to perform work as a law enforcement officer." (Robinson Decl. ¶ 5.) Robinson also states that it is standard practice for TSU PD to disempower a police officer or trainee when he is placed on administrative leave. (Id.) Massiah was on administrative leave for one day. (Id.)

[4] The dates in the ICI report are confusing, insofar as the report first states that Hullett submitted his Community Complaint on August 28, but then says it was submitted on August 22, 2020. (Doc. No. 46-5, at 11.) It then indicates that Massiah was interviewed in connection with the Community Complaint on August 27 (id. at 12) but actually served with process on August 29 (id. at 11). The court does not find these discrepancies to be material.

Massiah was interviewed by Detective Phelps about the Community Complaint, and the interview was recorded. (*Id.* at 12.) According to the ICI report, Massiah denied knowing that a process server was attempting to serve him, purported not to remember or to have any knowledge about many of the allegations, and refused to answer many questions posed by the investigator, including questions about where he lived, his telephone number, what vehicle he drove, and the identity of the woman who answered the door at the address listed as his. (*Id.* at 13–16.) Massiah, however, expressly denied speeding, running a traffic signal, or attempting to evade anyone. (*Id.* at 13.) He denied hiding in the woods to avoid the process server and denied receiving a telephone message from him. (*Id.* at 14.)

He answered some questions about his involvement with Virtue Enforcement Agency Enterprises, stating that this was a business he had started in 2010 and allegedly confirming that he "work[ed] the business." (*Id.* at 15.) According to the ICI report, Massiah advised that he was not aware of TSU PD's outside employment policy, but, when he was shown the policy that he had signed electronically, he acknowledged that he had reviewed and signed the policy electronically. He acknowledged that he had not notified his supervisors or chain of command about his outside employment. (*Id.*) At a second interview, conducted on September 2, 2020, Massiah allegedly advised that "he does perform various jobs off duty but the majority of his work is for charity." (*Id.* at 15.) He also denied several other allegations in the Community Complaint.

Massiah was specifically asked about his application to join a Fraternal Order of Police ("FOP") lodge on which he had stated that his job title was "Police Officer." (*Id.* at 16.) Asked if this was correct, Massiah responded that it was. Detective Phelps informed Massiah that he was not actually a Police Officer but an Officer in Training. (*Id.*) Massiah concluded the interview by refusing to answer questions about who Shelby Pressley is and whether she resided at 2272

Killington and then "stated that this was a personal vendetta against him" by Out of Bounds and certain of its employees. (*Id.* at 16.)

Detective Phelps also interviewed Calvin Hullett regarding the Community Complaint he had submitted. Hullett allegedly "advised that his submission was compiled over several months while attempting to serve Michael Massiah with civil process," that this was the second time he and his company had served Massiah, and that he had had similar problems the first time. (*Id.*)

On September 4, 2020, Detective Phelps concluded his report with a summary opining that Hullett's complaint "presented concerns involving" Massiah, "ranging from concealing his identity to avoid process serv[ice], operating a motor vehicle in an unsafe and reckless manner, and putting others in potential harm with his careless actions and mannerisms." (*Id.* at 17.) In addition, Phelps noted that Massiah had frequently refused to answer questions during the interview, had never provided his current address, was vague even when answering direct questions, and had been obviously untruthful on several occasions, including by (1) denying knowledge that a process server was trying to serve him; (2) denying knowledge of TSU PD's outside employment policy; and (3) claiming to be a sworn Police Officer in his FOP application. (*Id.* at 18.) Phelps believed that Massiah's untruthfulness and lack of professionalism had "potentially brought the Tennessee State University and its Police Department into a negative aspect." (*Id.*)

As a result of the ICI report, on September 19, 2020, Massiah was disempowered and placed on administrative leave with pay a second time. On September 21, 2020, Chief Robinson wrote a memorandum to TSU Vice President Horace Chase requesting his approval for the immediate termination of Massiah. (Sept. 21, 2020 Memorandum, Doc. No. 46-5, at 21–22.) In this Memorandum, Chief Robinson reported that (1) Massiah had taken 384 hours of sick leave,

far in excess of the leave time he had accrued; (2) because of a Community Complaint filed against him, which resulted in the Internal Affairs investigation, TSU PD had discovered that Massiah had outside employment that he had not previously disclosed to TSU, in violation of TSU HR Policy 6.26 regarding notification of outside employment; (3) the Community Complaint involved a private civil process server's attempts to serve Massiah with process and Massiah's repeated efforts to evade service of process, including by speeding, running stop signs, and hiding in the woods; and (4) the Internal Affairs investigation also revealed that Massiah had submitted an official FOP application in which he had falsely certified that he was a "full-fledged sworn police officer" (*id.* at 22).[5] Robinson recommended Massiah's termination based on his loss of "confidence in Mr. Massiah as a police officer candidate of TSU PD" and his "demonstrated . . . lack of character." (*Id.* at 21.)

On November 30, 2020, TSU President Glenda Glover received a Memorandum from TSU Vice President Horace Chase, recommending Massiah's termination. (*See* Doc. No. 46-6, Glover Decl. ¶ 3; *see also* Nov. 30, 2020 Memorandum, Doc. No. 46-6, at 4–5.) Glover has "final authority to terminate the employment of TSU employees." (Glover Decl. ¶ 3.) Glover approved Massiah's termination based on Chase's recommendation (*id.*), as documented by her signature on the

---

[5] In the late-filed and improperly authenticated Declaration submitted by Massiah, Massiah purports to deny many of the allegations in Hullett's Community Complaint and the ICI report, most notably denying that he ever exceeded the speed limit or that he presented untruthful information during the internal investigation. (Doc. No. 44 ¶ 10.) He denies "impersonating" a police officer on his FOP application and avers that he had been told that he was eligible for membership in the FOP. (*Id.* ¶¶ 11, 12.) He also claims that he was "told" that he did not need to report ownership of a company to TSU PD and denies that he actively "participated" in his business during his employment with TSU PD. (*Id.* ¶¶ 13–15.)

Memorandum (Doc. No. 46-6, at 5).[6] Massiah was terminated effective December 31, 2020. (Doc. No. 1, Compl. ¶ 10.)

### B.    Massiah's Complaints About "Discrimination"

In March 2020, Massiah complained that one of his supervisors, Sgt. Harold Taylor, had been disrespectful and intimidating toward him. TSU PD investigated this complaint, which resulted in Taylor's being disciplined for using an aggressive tone with Massiah and standing over him in a way that the plaintiff perceived as intimidating. (*See* Corrective Action/Formal Counseling Form, Doc. No. 46-4, at 2.) The plaintiff's complaint against Taylor did not involve allegations of race discrimination. (*See* Doc. No. 46-2, at 2–4.)

On August 3, 2020, Massiah emailed a copy of a document entitled "Second Formal Complaint of Discrimination" to TSU Chief of Police Gregory Robinson and other TSU PD employees. (*See* Doc. No. 46-2, at 7–8, 10–17) The plaintiff's Second Formal Complaint of Discrimination does not contain actual allegations of race discrimination, but it does contain references to "hostile work environment," "harassment," and "adverse action." (*Id.* at 11.) The plaintiff claimed that his direct supervisor created a "hostile work environment" and retaliated

---

[6] In his Response, the plaintiff asserts that Chase's Memorandum is not signed or authenticated, as a result of which it is not admissible evidence that can be considered in the context of a ruling on a motion for summary judgment, under Rule 56. He asserts on this basis that the defendant's motion "must fail." (Doc. No. 51, at 4.) The plaintiff is incorrect for several reasons.

First, while Rule 56 indeed provides that a party "may object that the material cited to support . . . a fact cannot be presented in a form that would be admissible in evidence," Fed. R. Civ. P. 56(c)(2), the plaintiff has not actually shown that Chase's Memorandum could not be presented in a form that would be admissible in evidence. In particular, it apparently would qualify as a record of a regularly conducted business activity, making up part of the plaintiff's personnel file maintained by TSU, and as such would be admissible under Rule 803(6) of the Federal Rules of Evidence. Second, it is not clear that the Memorandum is offered for the truth of the matters asserted. Rather, it appears to be offered as the basis for the defendant's decision to terminate the plaintiff. Finally, it is clear that Glover was entitled to, and did, rely on the authenticity of Chase's Memorandum and recommendation as the basis for her decision. She clearly has the ability to testify as to the basis for her decision, even if Chase's Memorandum *per se* were not admissible.

against him after he filed his first complaint against Taylor. (*Id.* at 12.) It also states (apparently falsely) that the plaintiff had filed his Second Formal Complaint "with the EEOC on June 21, 2020" because he had "continued to be harassed and retaliated against." (Doc. No. 46-2, at 7; *see id.* at 17.)

The plaintiff actually prepared and filed a Charge of Discrimination with the EEOC and Tennessee Human Rights Commission on October 26, 2020. (*See* Doc. No. 46-2, at 21.) In this Charge, the plaintiff alleges discrimination based on age, race, and disability, and he alleges that he was retaliated against for complaining about the alleged discrimination and harassment. (*Id.* at 19–21.)

At the time she authorized Massiah's termination, Glover did not know that he had filed a Charge of Discrimination with the EEOC or that he had ever claimed to have been subjected to discrimination of any kind. (Glover Decl. ¶ 4.) The plaintiff never discussed the EEOC Charge with Horace Chase or Chief Robinson. (Doc. No. 46-1, Massiah Dep. 229.) Chief Robinson was not aware that the plaintiff had ever claimed to have been subjected to discrimination on the basis of race, and he never informed Chase or Glover that Massiah had made any complaints. Massiah testified that he spoke with Linda Spears in Human Resources at some point about his EEOC complaint (Doc. No. 46-1, at 13–14), but the record does not indicate when that occurred.

## III.    STANDARD OF REVIEW—RULE 56

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary

under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record—including, *inter alia*, depositions, documents, affidavits, or declarations—that it believes demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018); Fed. R. Civ. P. 56(c)(1)(A). The non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Pittman*, 901 F.3d at 628. The court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Id.* Credibility judgments and weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018).

## IV. DISCUSSION

In the absence of direct evidence of retaliation, the court addresses Title VII retaliation claims under "the familiar *McDonnell Douglas* burden-shifting framework." *Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 448 (6th Cir. 2020) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973)). Under this framework, Massiah has the initial burden of establishing a *prima facie* case of retaliation. To do so, he must point to evidence sufficient to convince a jury that: (1) he engaged in activity protected under Title VII; (2) TSU knew that he exercised protected rights; (3) an adverse employment action was subsequently taken against him; and (4) there is a causal connection between the protected activity and the adverse action. *Id.*; *Laster v. City of*

*Kalamazoo*, 746 F.3d 714, 730–31 (6th Cir. 2014). If the plaintiff can establish his *prima facie* case, the burden then shifts to the defendant to offer a "legitimate, nondiscriminatory reason" for its action. *McDonnell Douglas*, 411 U.S. at 802. If it does so, the burden of production shifts back to the plaintiff to demonstrate that TSU's proffered reason was a mere pretext for discrimination. *Kenney*, 965 F.3d at 448.

TSU argues that (1) the plaintiff cannot establish a *prima facie* case of retaliation; and (2) even if he could, he cannot rebut the defendant's legitimate, non-retaliatory reasons for terminating the plaintiff.

### A.     The Plaintiff's *Prima Facie* Case

#### 1.     The Protected Activity

The first element of the plaintiff's *prima facie* case is that he engaged in activity protected under Title VII. Although there is no dispute that the filing of the EEOC Charge qualifies as protected activity, the plaintiff appears to be alleging that his disempowerments on August 2 and September 19, 2020 (before he filed the EEOC Charge) were in retaliation for his having filed complaints of "discrimination" on March 18, 2020 and June 21, 2020. The defendant argues that the plaintiff's first and second complaints do not qualify as protected activity, because the plaintiff did not allege that he was the target of discrimination based on race (or any other characteristic protected by Title VII) and could not reasonably have believed that he had engaged in protected activity.

The Sixth Circuit has explained that, "[t]o come within the protection of Title VII, [a plaintiff] must establish that he challenged an employment practice that he reasonably believed was unlawful." *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 645 (6th Cir. 2015) (citing *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 580 (6th Cir. 2000)). Based on this definition, it has concluded that "a demand that a supervisor cease his/her harassing conduct constitutes

protected activity covered by Title VII." *Id.* (quoting *EEOC v. New Breed Logistics*, 783 F.3d 1057, 1067 (6th Cir. 2015)). On the other hand, Title VII does not protect an employee who raises merely a "vague charge of discrimination." *Id.* (quoting *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989)).

In *Yazdian*, the court found that the plaintiff had engaged in protected activity when he told his manager that he was "going to respond with counsel," "bring [him] up on charges," and "[b]ring a lawsuit against [him]" and alleged that he was suffering a "hostile work environment." *Id.* at 646. The court concluded that these allegations were sufficient to put the defendant "on notice that [the plaintiff] believed that [his manager's] conduct was illegal." *Id.* The court noted in particular that "hostile work environment" is "a term of art, which refers to an unlawful employment practice under Title VII that arises because of 'discriminatory intimidation, ridicule, and insult[s]' repeatedly directed at an employee on the basis of a protected characteristic." *Id.* (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115–16 (2002)). The court held that " an employee who complains that an employer is creating a 'hostile work environment' engages in Title-VII-protected activity when the context objectively reveals that the employee is using the expression to complain about repeated abusive discriminatory comments or treatment" and that a reasonable jury in that case could conclude that the plaintiff used and intended the phrase to reference discriminatory treatment based on a protected characteristic. *Id.*

In this case, the plaintiff's first "complaint" references "workplace harassment" allegedly perpetrated by one individual, Sergeant Taylor, but the complaint contains no reference whatsoever to race or any other protected characteristic. Given the entire context of the complaint, no reasonable jury could find that the complaint challenged an employment practice that the plaintiff reasonably believed was unlawful under Title VII.

The Second Formal Complaint of Discrimination, however, while also vague with respect to details, incorporates enough "terms of art" to have conveyed to TSU the plaintiff's belief that he had been subjected to illegal discrimination. In particular, in his Second Formal Complaint, the plaintiff alleges that he has been subject to "continued" harassment, a "hostile work environment," and retaliation, and he states that he is filing the complaint with the EEOC (although, again, there is no evidence that he actually did so at that time). While the context of the document as a whole calls into question whether any of the retaliation and harassment the plaintiff allegedly suffered was "because of" race,[7] the court nonetheless finds that a reasonable jury could conclude that the plaintiff's complaints were "based on 'a reasonable and good faith belief that the opposed practices were unlawful,'" *Yazdian*, 793 F.3d at 646 (quoting *Johnson*, 215 F.3d at 579), particularly in light of his reference to the EEOC (and regardless of whether he actually filed an EEOC charge in connection with his Second Formal Complaint).

### 2. Whether TSU Knew that the Plaintiff Engaged in Protected Activity

There is no evidence that the relevant decisionmakers—Chief Robinson, Vice President Chase, and President Glover—knew that the plaintiff filed the EEOC Charge in October 2020.[8] However, it is also undisputed that Massiah emailed a copy of his Second Formal Complaint to Chief Robinson, as well as to TSU's Department of Equity and Inclusion and to Linda Spears, TSU's Associate Vice President of Human Resources, on August 3, 2020. (Doc. No. 46-2, at 7.) For purposes of the defendant's motion, the court finds that the plaintiff has established that the

---

[7] Notably, the plaintiff, who is a Black male, stated in the Second Formal Complaint that he was "pleased to be hired and work [at TSU] with great African American leaders and police officers who would be honest role models to [him]." (Doc. No. 46-2, at 7.) It appears from context that most of the individuals with whom the plaintiff worked, including Chief Robinson, were also Black.

[8] In addition, Chief Robinson's recommendation to Chase that Massiah be terminated is dated September 21, 2020, well before the plaintiff filed his EEOC Charge on October 26, 2020.

defendant knew that he engaged in protected activity by submitting the Second Formal Complaint. In addition, there is at least a remote possibility that Linda Spears in Human Resources knew at the time of his termination that Massiah had filed an EEOC Charge.

       *3.*     *Causal Connection*

There is no dispute that the plaintiff suffered adverse employment actions when he was "disempowered" and placed on administrative leave with pay on August 2 and again on September 19, 2020 and when he was terminated in December 2020. The question is whether he can establish a causal connection between the adverse actions and his protected activity.

The plaintiff cannot establish a causal connection between his filing the EEOC Charge in October 2020 and his disempowerments, because the disempowerments preceded the filing of the EEOC Charge. There also cannot be a causal connection between the plaintiff's Second Formal Complaint and his first disempowerment, because the plaintiff's email submitting his Second Formal Complaint to Robinson and others is dated August 3, 2020, but his disempowerment took place a day earlier, on August 2, 2020. Again, the later event could not have caused the earlier.

Regarding the causal connection between the EEOC Charge and his termination, Robinson set the wheels in motion for Massiah's termination well before the plaintiff filed his EEOC Charge, which tends to weigh against any inference of causation between those events. However, the actual termination decision was not made until after he filed the EEOC Charge. And, while there is no actual evidence that Chase or Glover knew about the EEOC Charge when they, respectively, recommended and approved Massiah's termination, there is, as noted above, at least a remote possibility that HR knew about the EEOC Charge. In addition, Robinson was clearly aware of the plaintiff's Second Formal Complaint when he made the decision to disempower and suspend him and to recommend termination.

The defendant argues that the plaintiff has no evidence of a causal connection between any protected activity and the adverse actions aside from the temporal proximity between the various events and that, in the Sixth Circuit, temporal proximity between protected activity and an adverse action, standing alone, is not sufficient to give rise to an inference of a causal connection. (Doc. No. 44, at 10 (citing *Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000)).)

The defendant is generally correct that, to plausibly establish a causal connection between protected activity and an adverse action, a plaintiff must put forth some fact creating an inference that the adverse action would not have occurred without the employee's first engaging in protected activity. *See Nguyen*, 229 F.3d at 563. Importantly, this element requires "but-for" causation, "meaning the plaintiff must furnish evidence that 'the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'" *Barrow v. City of Cleveland*, 773 F. App'x 254, 261 (6th Cir. 2019) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)).

However, "[w]here an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a *prima facie* case of retaliation." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). Thus, for example, when an employee is fired the same day his employer learns of his protected activity, this "acutely" close proximity in time is sufficient to "constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Id.* On the other hand, "where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Id.*

The Sixth Circuit has recently reaffirmed that "[t]emporal proximity alone generally is not sufficient to establish causation" and that "[e]xceptions to this rule are 'rare,' even in instances involving relatively short time periods." *Kenney*, 965 F.3d at 448–49 (quoting *Mickey*, 516 F.3d at 525; other citations omitted). In *Kenney*, the plaintiff was fired two and one-half months after complaining about the employer's discriminatory hiring practices. The court held that "temporal proximity is one consideration in assessing whether [the plaintiff] has satisfied her burden to show causation between her complaint and her termination. But a roughly 75-day delay between her protected activity and an adverse employment action is not, standing alone, a convincing case for proving causation." *Id.* at 449; *see also Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Sch.*, 974 F.3d 652, 664–65 (6th Cir. 2020) (noting that the court had denied summary judgment "where a defendant took adverse action against a plaintiff just a few months after learning of his or her protected activity" (citing *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 306 (6th Cir. 2012) (holding that a lapse of two months was sufficient to show a causal connection based on temporal proximity); *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004) (holding that a lapse of three months was sufficient to show a causal connection based on temporal proximity)).

In this case, the length of time between the protected activity (August 3) and the plaintiff's second disempowerment (September 19) and Robinson's Memorandum to Horace Chase recommending termination (September 21)—which set in motion the process that led to the plaintiff's termination—is, at least arguably, sufficiently close in time, standing alone, to permit an inference of causation between the events. Likewise, the plaintiff's filing of the EEOC Charge took place just days before Horace Chase drafted his Memorandum to Glover recommending Massiah's termination and less than two months prior to Glover's approval of the recommendation. On the basis of this relatively close temporal connection between the plaintiff's protected activity

and the adverse employment actions, the court finds that the plaintiff, just barely, has established a causal connection and, thus, a *prima facie* case of Title VII retaliation.

### B.    Pretext

As set forth above, once an employee states a *prima facie* discrimination claim, the burden shifts to the defendant to articulate a legitimate, non-discriminatory explanation for its actions. "This is not a burden to 'persuade the court that it was actually motivated by the proffered reasons.' The defendant only has to present 'clear and reasonably specific' reasons that will 'frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext.'" *Harris v. City of Akron*, 836 F. App'x 415, 419 (6th Cir. 2020) (quoting *Tex. Dep't Cmty. Affairs v. Burdine*, 450 U.S. 248, 254, 258, 255–56 (1981)). Once the defendant satisfies this burden, it rebuts the presumption of discrimination raised by the *prima facie* case. *Id.* And, in this event, the burden shifts back to the plaintiff to show that the employer's explanation is pretext for discrimination. *Burdine*, 450 U.S. at 255.

"All that a plaintiff must show in order to overcome a defendant's motion for summary judgment at this stage is that a reasonable juror could find that the defendant's reasons were pretextual." *Kirilenko-Ison*, 974 F.3d at 667. That is, the plaintiff "does not need to prove pretext; [he] only needs to show that the question of pretext is a genuine factual dispute." *Id.* (citing *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 813 (6th Cir. 2011) (cautioning that "in the context of summary judgment . . . the [*McDonnell Douglas*] burden-shifting analysis can obfuscate the appropriate question—whether there exists a genuine issue of material fact")). Generally, to satisfy his burden at this juncture, the plaintiff must produce "sufficient evidence from which the jury could reasonably reject the defendants' explanation and infer that [they] intentionally discriminated against him." *Harris*, 836 F. App'x at 420 (quoting *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 586 (6th Cir. 2009)).

In this case, TSU has offered ample non-retaliatory reasons for the plaintiff's second disempowerment and ultimate termination: absences from work far in excess of his accrued leave; failure to seek permission before engaging in outside employment, in violation of TSU PD policy; lying to the TSU PD Internal Affairs investigator about his knowledge of the outside employment policy; being uncooperative with the TSU PD Internal Affairs investigation; and conduct unbecoming a TSC police officer. (*See* Doc. No. 46-5, at 21–22; Doc. No. 46-6, at 4–5.)

In response to the defendant's pretext argument, the plaintiff "contends the articulated reasons are mere pretext, and the real reason for determining he did not meet the interview criteria[9] was because he filed an internal complaint on March 18, 2020, another August 2, 2020 and a third with the EEO on October 26, 2020." (Doc. No. 51, at 7.) But his Response memorandum points to no evidence to support that assertion. He argues only that an inference of pretext arises from TSU's

> changing and dynamic narrative for why Massiah was "disempowered" claiming that he provided fake doctor's notes. Robinson claimed that Massiah had used over 383 hours of sick time. The pay records do not corroborate Robinson's unsupported comment. The letter Robinson wrote to Horace Chase is different than the reasons stated in [Chase's] Memorandum . . . to President Glover.

(*Id.* at 11.)

The plaintiff is correct that "[a]n employer's changing rationale for making an adverse employment decision can be evidence of pretext." *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 713 (6th Cir. 2007) (quoting *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1167 (6th Cir. 1996)). But here, the plaintiff's assertions are simply not supported by the record. Although Chase's Memorandum to Glover is not a verbatim repetition of Robinson's Memorandum to Chase

---

[9] In his Declaration, Chief Robinson states that he made the decision on September 15, 2020 not to send the plaintiff to P.O.S.T. certification training, because he was already planning to recommend the plaintiff's termination, which he did by means of his September 19, 2020 Memorandum to Horace Chase. It is unclear why the plaintiff focuses on this adverse action, among the others.

and its focus is slightly different, the rationale for recommending the plaintiff's termination rests on the same basic findings: the plaintiff's absenteeism, lack of truthfulness, failure to notify TSU of his outside employment, and conduct unbecoming a police officer.

Even if the court were inclined to consider the plaintiff's belated and improperly authenticated Declaration, the evidence he offers therein is also not sufficient to establish pretext. He attempts to refute (or create an issue of fact as to) some of the statements made by Calvin Hullett in his Community Complaint and by Detective Thomas Phelps in the ICI report. However, the plaintiff offers no basis for concluding that Chief Robinson's reliance on the particularized facts in the ICI report was unreasonable or that Robinson had any reason to disbelieve the allegations therein. Likewise, there is no evidence that Horace Chase had any reason not to rely on the particularized facts presented to him by Robinson or that President Glover was unreasonable in accepting Horace Chase's recommendation of termination. In the Sixth Circuit, "[w]hen an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be 'mistaken, foolish, trivial, or baseless.'" *Chen v. Dow Chem. Co.*, 580 F.3d 394, 401 (6th Cir. 2009) (quoting *Clay*, 501 F.3d at 713). The various decisionmakers clearly relied on the particularized facts set forth in the ICI report and the Community Complaint. Even if the court were to accept as true the averments in the plaintiff's Declaration, his testimony does not support a conclusion that TSU's proffered reasons were not the true reasons for the adverse employment action or were insufficient to support it, nor has Massiah pointed to any evidence—aside from mere temporal proximity—remotely suggesting that the decision to terminate him was connected in any manner with his filing internal complaints or the EEOC Charge.

Because the plaintiff points to no evidence in the record from which a reasonable jury could find that the defendant's reasons for terminating the plaintiff are pretextual, the defendant is entitled to summary judgment.

## V. CONCLUSION

For the reasons set forth herein, the defendant's Motion for Summary Judgment will be granted, and its Motion for Judgment on the Pleadings will be denied as moot. The plaintiff's Motion to Amend will be denied as moot and because the plaintiff never complied with Rule 7.01(a).

An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge